Shiloh Hernandez
Mary Cochenour
Earthjustice
313 East Main Street
Bozeman, MT 59772-4743
(406) 586-9699
mcochenour@earthjustice.org
shernandez@earthjustice.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL INFORMATION CENTER, SIERRA CLUB, WILDEARTH GUARDIANS, and CITIZENS FOR CLEAN ENERGY, | Case No. CV-23-28-GF-BMM |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Plaintiffs, | |
| vs. | |
| MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY, CHRISTOPHER DORRINGTON, in his official capacity as director of Montana Department of Environmental Quality, and DAN WALSH, in his official capacity as Bureau Chief of the Mining Bureau of the Montana Department of Environmental Quality, | |
| Defendants. | |

**INTRODUCTION**

1.    Reminiscent of the days when the state legislature performed the bidding of the Anaconda Copper Company, the 68th Montana Legislature passed and Governor Greg Gianforte signed two laws purporting to amend Montana's federally approved program for regulating coal mining: House Bill 576 and Senate Bill 392. Multiple provisions of these laws conflict with the federal Surface Mining Control and Reclamation Act (SMCRA or Surface Mining Act), by empowering coal companies to pollute Montana's waters with minimal accountability, while limiting public oversight of coal mining.

2.    The bills were drafted and shepherded through the legislative process at the behest of coal industry lobbyists. The legislature and Governor approved the laws despite uniform opposition from Montana ranchers, landowners, concerned members of the public, and conservation groups.

3.    Under federal law, these provisions may not become effective unless and until they are first reviewed by federal agencies, including the U.S. Office of Surface Mining Reclamation and Enforcement (OSMRE) and the U.S. Environmental Protection Agency (EPA), subjected to public notice and comment, and found to be no less stringent or effective than provisions of federal law.

4.    In direct contravention of clear requirements of federal law, the provisions of House Bill 576 and Senate Bill 392 purport to make these changes

2

immediately effective, prior to federal review, and, in the case of House Bill 576, retroactively applicable to current cases brought under the existing program.

5.     Because House Bill 576 and Senate Bill 392 violate federal law, Plaintiffs Montana Environmental Information Center, Sierra Club, WildEarth Guardians, and Citizens for Clean Energy (Plaintiffs) seek declaratory and injunctive relief preventing Defendants Montana Department of Environmental Quality (DEQ), DEQ Director Christopher Dorrington, and DEQ Mining Bureau Chief Dan Walsh from applying them unless and until they are first reviewed and approved as required by federal law.

## JURISDICTION AND VENUE

6.     Jurisdiction is proper pursuant to the citizen suit provision of the Surface Mining Act which permits suits in federal court to compel compliance to be brought "against … the appropriate State regulatory authority to the extent permitted by the eleventh amendment to the Constitution where there is alleged a failure of the … appropriate State regulatory authority to perform any act or duty under this chapter which is not discretionary … with the appropriate State regulatory authority." 30 U.S.C. § 1270(a)(2).

7.     Prior to bringing an action under the Surface Mining Act, the plaintiff must "give[] notice in writing of such action … to the appropriate State regulatory authority" and "such action may be brought immediately after such notification in

3

the case where the violation or order complained of … would immediately affect a legal interest of the plaintiff." *Id.* § 1270(b)(2). Here, Plaintiffs gave proper notice to Defendants. House Bill 576 and Senate Bill 392 immediately affect Plaintiffs' legal interests. House Bill 576 immediately affects existing litigation premised in part on the provision of the Montana program that the law seeks to weaken. Senate Bill 392 immediately chills Plaintiffs' ability and interest in challenging unlawful coal permitting decisions in Montana.

8.    The injunctive and declaratory relief sought here are available pursuant to the Surface Mining Act, 30 U.S.C. § 1270(a) and 28 U.S.C. §§ 2201, 2202.

9.    Venue is proper because the strip-mining operations complained of, the Rosebud Strip-Mine and the Bull Mountains Longwall Mine, are located in this district. 30 U.S.C. § 1270(c)(1).

10.    Divisional venue is proper because Plaintiff Citizens for Clean Energy resides in Cascade County. L.R. 3.2(b); Mont. Code Ann. § 25-2-126 (proper place of trial for actions against State of Montana includes "the county of the plaintiff's residence").

**PARTIES**

11.    Plaintiff Montana Environmental Information Center (MEIC) is a nonprofit organization founded in 1973 with approximately 5,000 members and

4

supporters. MEIC is dedicated to the preservation and enhancement of the natural resources and natural environment of Montana, particularly the protection of water quality. MEIC is committed to assuring that state and federal officials comply with and fully uphold the laws of the United States and the State of Montana that are designed to protect the environment from pollution. MEIC and its members have intensive, long-standing recreational, aesthetic, scientific, professional, and spiritual interests in the responsible production and use of energy, and the land, air, and waters across the state. MEIC members live, work, and recreate in areas that are adversely impacted by the Rosebud Strip-Mine and the Bull Mountains Longwall Mine. MEIC brings this action on its own behalf, and on behalf of its adversely affected members.

12.    Plaintiff Sierra Club is America's largest grassroots environmental organization, with more than 800,000 members nationwide, including more than 3,200 members who live in Montana. In addition to creating opportunities for people of all ages, levels, and locations to have meaningful outdoor experiences, the Sierra Club works to safeguard the health of our communities, protect wildlife, and preserve our remaining wild places through grassroots activism, public education, lobbying, and litigation. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting

humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives.

13.    Sierra Club members live, work, and recreate in areas that already are, or will be, adversely impacted by the Rosebud Strip-Mine and Bull Mountains Longwall Mine. Sierra Club's concerns encompass the exploration, enjoyment, and protection of the land, air, and water impacted by these mines. Sierra Club dedicates organizational resources specifically to safeguarding communities and the environment from the impacts of coal mining and combustion. Sierra Club brings this action on its own behalf, and on behalf of its adversely affected members.

14.    Plaintiff WildEarth Guardians (Guardians) is a nonprofit conservation organization with more than 200,000 members and activists throughout the United States, including nearly 900 members who live in Montana. Guardians has a major office in Missoula, Montana. Guardians' mission is to protect and restore the wildlife, wild rivers, wild places, and health of the American West. Through its Climate and Energy Program, Guardians is dedicated to protecting the American West from the dangers it faces from the climate crisis. Guardians' members and staff have recreational, aesthetic, scientific, professional, and spiritual interests in a protected and stable climate, and an environment that is sustained by a protected and stable climate. Guardians' members use and plan to continue to use and enjoy

6

landscapes impacted by the Rosebud Strip-Mine and Bull Mountains Longwall Mine. Guardians brings this action on its own behalf, and on behalf of its adversely affected members.

15.     Plaintiff Citizens for Clean Energy, Inc. (CCE) is an all-volunteer group of Montana citizens from many backgrounds and political persuasions. CCE's objective is to convince decision makers that adequate, clean, efficient, and cost-effective energy for our community, state and world can be obtained without destroying our health, lifestyle, environment, and heritage. CCE members are united by a very deep concern about the harm fossil fuels cause to our world. With all the wonderful resources available in this country, CCE asserts that there are many good solutions for clean power to serve our needs. CCE believes the days of fossil fuel fired generators are now numbered. CCE members live, work, and recreate in areas that are adversely impacted by the Rosebud Strip-Mine. CCE brings this action on its own behalf, and on behalf of its adversely affected members.

16.     The Rosebud Strip-Mine is an approximately 40,000-acre strip-mine that is larger than the City of Billings. Its un-reclaimed pits, spoil piles, and active mining operations stretch for miles across the landscape. The towering draglines can be seen stripping the earth from miles away. The mine discharges pollution into waterways—East Fork Armells Creek, West Fork Armells Creek, and

tributaries of Rosebud Creek—which are impaired and failing to meet water quality standards. Leaking ash ponds from the power plant further pollute these waterways and their tributaries. The mine trucks and conveys coal along public roads to the adjacent Colstrip Power Plant, which emits vast amounts of toxic and harmful pollution. Federal agencies have found this pollution likely contributes to elevated levels of respiratory disease and cancer in the surrounding area. The Clean Air Task Force calculates that pollution from the mine-mouth operation in Colstrip causes 48 premature deaths, 10 emergency room visits, 19 heart attacks, 29 cases of acute bronchitis, 540 asthma attacks, and 2,526 lost workdays each year. Clean Air Task Force, Toll from Coal, https://www.tollfromcoal.org/#/map/(title:6076//detail:6076//map:6076/MT). Plaintiffs' members, who for many years have regularly spent time in and have deep connections to the area, are adversely impacted by the operations of the Rosebud Strip-Mine and Colstrip Power Plant.

17.    The Bull Mountains Longwall Mine is an underground longwall coal mine in the Bull Mountains of central Montana. The longwall mining method removes the entire underground coal seam in a series of passes with a shearing machine. After the coal is removed, the operation advances, causing the roof to collapse or subside into the void. The process is devastating to the land above the mine. It creates large fractures on the landscape that can be a dozen feet wide,

dozens of feet deep, and over a quarter mile long. Other subsidence fractures are narrow and can be concealed by grass. These fractures threaten anyone walking, riding a horse, or driving a vehicle on the land above the mine. Cattle can step into the smaller fractures and break their legs. Many of the fractures have not been reclaimed for years. Defendants do not even require reclamation of fractures on slopes greater than 20 degrees. The Bull Mountains Longwall Mine has also dewatered numerous water sources in the Bull Mountains. These springs are critical to the ecology and economy of the Bull Mountains. Defendants have permitted the mine operator to avoid reclaiming the majority of the impacted water resources. Defendants do not require the mine operator to reclaim water resources to support aquatic life or wildlife use until all future mining has been completed—some unidentified point in the future. As a result, springs and stream reaches that are critical to the ecological health of the Bull Mountains have been dry or significantly dewatered for years. Plaintiffs' members, who for many years have regularly spent time in and have deep connections to the area, are adversely impacted by the Bull Mountains Longwall Mine.

18.    Plaintiffs MEIC and Sierra Club have existing litigation pending before the Montana Supreme Court, Montana district court, and a Montana administrative board premised at least in part on the Montana program's current protections of water resources that would be weakened by House Bill 576. This

litigation involves both the Rosebud Strip-Mine and the Bull Mountains Longwall Mine. The immediate effectiveness provision of House Bill 576 immediately adversely affects their legal interests in these cases.

19.     Plaintiffs are currently considering challenging unlawful coal permitting decisions by Defendants, including at the Rosebud and Bull Mountains coal mines. Some of these permitting decisions are subject to 30-day statutes of limitations. The immediate effectiveness provision of the "loser pays" provision of Senate Bill 392 immediately chills Plaintiffs' ability to challenge these permitting decisions.

20.     Defendant Montana Department of Environmental Quality is the state regulatory authority charged with implementing and enforcing the Montana coal program (the Montana Strip and Underground Mine Reclamation Act (MSUMRA or Montana program)) under the federal Surface Mining Act.

21.     Defendant Christopher Dorrington is the Director of the Montana Department of Environmental Quality, an agency of the State of Montana, and is charged with implementing and enforcing the Montana program. Under the Montana program, Director Dorrington is charged with permitting, oversight, administration, and enforcement of the Montana program.

22.     Defendant Dan Walsh is the Bureau Chief of the Mining Bureau at the Montana Department of Environmental Quality. In this role, Mr. Walsh has direct

supervisory authority over permitting, oversight, administration, and enforcement of the Montana program.

23.    Under the Surface Mining Act, Director Dorrington and Bureau Chief Walsh are required to notify the Director of OSMRE in writing of proposed changes in the Montana program. 30 C.F.R. § 732.17(b). Director Dorrington and Bureau Chief Walsh are prohibited from applying or enforcing any proposed changes in the Montana program unless and until the proposed changes are reviewed and approved as required by the Surface Mining Act. *Id.* § 732.17(g), (h).

## LEGAL BACKGROUND

*The Federal Surface Mining Act*

24.    The Surface Mining Act was enacted to "establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a).

25.    Congress recognized that "many surface mining operations result in disturbances of surface areas that burden and adversely affect commerce and the public welfare by destroying or diminishing the utility of land for commercial, industrial, residential, recreational, agricultural, and forestry purposes, by causing erosion and landslides, by contributing to floods, by polluting the water, by destroying fish and wildlife habitats, by impairing natural beauty, by damaging the property of citizens, by creating hazards dangerous to life and property by

degrading the quality of life in local communities, and by counteracting governmental programs and efforts to conserve soil, water, and other natural resources." *Id.* § 1201(c).

26.     The Surface Mining Act, setting minimal federal standards, was born out of "congressional dissatisfaction with state mining regulation practices." *In re Permanent Surface Mining Reg. Litig.* (*In re Permanent*), 653 F.2d 514 (D.C. Cir. 1981). "Despite claims from some quarters that State reclamation laws have improved so significantly that Federal mining standards are no longer needed, the hearing record abounds with evidence that this is simply not the case. For a variety of reasons, including the reluctance of the State to impose stringent controls on its own industry, serious abuses continue." H.R. Rep. No. 95-218 at 58 (1977).

27.     Under the Surface Mining Act, states may develop and administer regulatory programs that meet federal standards. 30 U.S.C. § 1253(a). "States with an approved State program shall implement, administer, enforce and maintain it in accordance with the Act, this chapter and the provisions of the approved State program." 30 C.F.R. § 733.11.

28.     Even after a state receives approval for its coal regulatory program, federal oversight remains through review of state programs and independent federal inspection and enforcement authority. 30 U.S.C. §§ 1253, 1254, 1267, 1271. "Skepticism about the states' willingness to implement the federal program

justified the Secretary's continuing oversight role." *In re Permanent*, 653 F.2d at 520.

29.     Moreover, Congress believed that public oversight of state regulatory actions and coal mining operations would be necessary to prevent further abuse: "While it is confident that the delegation of primary regulatory authority to the States will result in adequate State enforcement, the committee is also of the belief that a limited Federal oversight role as well as increased opportunity for citizens to participate in the enforcement program are necessary to assure that the old patterns of minimal enforcement are not repeated." H.R. Rep. No. 95-218 at 129 (1977).

30.     Accordingly, if a state proposes changes to an approved regulatory program, it must promptly notify OSMRE of the proposed change. 30 C.F.R. § 732.17(b). State regulators are prohibited from applying or enforcing any proposed changes in the Montana program unless and until the proposed changes are reviewed and approved as required by the Surface Mining Act and its implementing regulations. *Id.* § 732.17(g), (h).

31.     The federal regulatory authority, OSMRE, must review the proposed program change for consistency with the Surface Mining Act, publish the proposed change in the federal register, and solicit and respond to public comment. *Id.* § 732.17(h). OSMRE may, in its discretion, hold a public hearing, depending on the subject matter of the proposed change, the complexity of the issues, and

whether hearings have already been held in the state. *Id.* § 732.17(h)(5). The proposed change "shall not be approved" until OSMRE has solicited and publicly disclosed the views of the EPA and other federal agencies, and "[o]btained written concurrence" of the EPA "with respect to those aspects of a State program amendment(s) which relate to air or water quality standards" under the Clean Water Act or the Clean Air Act. *Id.* § 732.17(h)(11).

32.     Under the Surface Mining Act, coal mining may not be permitted unless and until the permit applicant affirmatively demonstrates that it will not cause certain harm—called "material damage"—to water quality or quantity. 30 U.S.C. § 1260(b)(3). Under the Surface Mining Act, the provisions of the Clean Water Act establish minimum criteria for material damage. 48 Fed. Reg. 43,956, 43,973 (Sept. 26, 1983) (explaining "OSM has not established fixed criteria [for material damage], except for those established under [30 C.F.R.] §§ 816.42 and 817.42 related to compliance with water-quality standards and effluent limitations"); *see also* 30 U.S.C. § 1292(a)(3) ("Nothing in this chapter shall be construed as superseding, amending, modifying, or repealing … with any rule or regulation promulgated thereunder, including, but not limited to … The Federal Water Pollution Control Act (79 Stat. 903, as amended, the State laws enacted pursuant thereto, or other Federal laws relating to preservation of water quality.")).

33.    To assure that a regulatory authority has sufficient information to make a rational material damage determination regarding the cumulative impacts of coal mining on water, the Surface Mining Act requires a permit applicant to supply detailed baseline information and a determination about surface water and groundwater quality and quantity. 30 U.S.C. § 1257(B)(11) (requiring a permit application to contain "a determination of the probable hydrologic consequences of the mining and reclamation operations, both on and off the mine site, with respect to the hydrologic regime, quantity and quality of water in surface and ground water systems including the dissolved and suspended solids under seasonal flow conditions and the collection of sufficient data for the mine site and surrounding areas so that an assessment can be made by the regulatory authority of the probable cumulative impacts of all anticipated mining in the area upon the hydrology of the area and particularly upon water availability").

34.    The requirement that a permit application contain a determination of the probable hydrologic consequences of mining is not required if the necessary data is not available; however, no permit may be approved until this information is available and incorporated into the permit. *Id.* ("[*P*]*rovided, however*, That this determination shall not be required until such time as hydrologic information on the general area prior to mining is made available from an appropriate Federal or

15

State agency: *Provided further*, That the permit shall not be approved until such

information is available and is incorporated into the application ….").

35.    To promote public participation, the Surface Mining Act provides for

recovery of costs and attorney's fees by members of the public who bring

successful litigation against regulators or coal companies who violate the law. *Id.*

§§ 1270(d), 1275(e).

36.    Congress specifically found:

> The success or failure of a national coal surface mining regulation
> program will depend, to a significant extent, on the role played by
> citizens in the regulatory process. The State regulatory authority or
> Department of Interior can employ only so many inspectors, only a
> limited number of inspections can be made on a regular basis and only
> a limited amount of information can be required in a permit or bond
> release application or elicited at a hearing. Moreover, a number of
> decisions to be made by the regulatory authority in the designation and
> variance processes under the Act are contingent on the outcome of land
> use issues which require an analysis of various local and regional
> considerations. While citizen participation is not, and cannot be, a
> substitute for governmental authority, citizen involvement in all phases
> of the regulatory scheme will help insure that the decisions and actions
> of the regulatory authority are grounded upon complete and full
> information. In addition, providing citizen access to administrative
> appellate procedures and the courts is a practical and legitimate method
> of assuring the regulatory authority's compliance with the requirement
> of the Act.
>
> In many, if not most, cases in both the administrative and judicial
> forum, the citizen who sues to enforce the law, or participates in
> administrative proceedings to enforce the law, will have little or no
> money with which to hire a lawyer. If private citizens are to be able to
> assert the rights granted them by this bill, and if those who violate this
> bill's requirements are not to proceed with impunity, then citizens must

have the opportunity to recover the attorneys' fees necessary to vindicate their rights.

S. Rep. No. 95-128 at 59 (1977).

37.    By contrast, to prevent the risk of costs and fees from chilling public participation, Congress intended that such costs and fees may only be awarded against members of the public if they bring litigation "in bad faith." *Id.* ("Attorneys' fees may be awarded to the permittee or government when the suit or participation is brought in bad faith.").

38.    Accordingly, the Surface Mining Act's implementing regulations set forth this asymmetrical fee recovery system. 43 C.F.R. § 4.1294(a)-(d).

*The Montana Program*

39.    Montana, through Defendants, administers a federally approved state program—MSUMRA (or, as noted, "Montana program"). 30 C.F.R. Part 926; Mont. Code Ann. §§ 82-4-201 to -254.

40.    In addition to meeting the minimum requirements of the Surface Mining Act, the Montana program is intended to secure Montanans' unique and powerful right to a clean and healthful environment. Mont. Code Ann. § 82-4-202(1)-(2); Mont. Const. art. II, § 3, art. IX, § 1. As such, it is the policy of the Montana program to "maintain and improve the state's clean and healthful environment"; "protect the environmental life support system from degradation";

and "prevent unreasonable degradation of its natural resources." Mont. Code Ann. § 82-4-202(1)(a)-(c).

41.     Consistent with the requirement that it be at least as protective as the Surface Mining Act, the Montana program currently has provisions that mirror the aforementioned provisions regarding material damage, hydrologic data, and asymmetrical attorney's fees.

42.     The Montana program currently defines "material damage" to water resources to include any "violation of a water quality standard." Mont. Code Ann. § 82-4-203(32).

43.     The Montana program currently requires permit applications to contain a determination of probable hydrologic consequences of proposed strip or underground coal mining. *Id.* § 82-4-222(1)(m). Consistent with the Surface Mining Act, the Montana program does not require such a determination until all relevant hydrologic information in the area is available, but prohibits approval of a permit until such information is obtained and incorporated into the permit. *Id.* ("However, this determination is not required until hydrologic information on the general area prior to mining is made available from an appropriate federal or state agency. The permit may not be approved until the information is available and is incorporated into the application.").

44.    Consistent with the Surface Mining Act, the Montana program currently provides for asymmetrical availability of attorney's fees to encourage public participation, while protecting members of the public who act in good faith from adverse fee awards. *Compare* Admin. R. Mont. 17.24.1307(1) ("Whenever any final order is issued at the request of any person other than the permittee, permit applicant, or the department as a result of any administrative proceeding under the Act, appropriate and reasonable costs, expenses, and attorney fees incurred for or in connection with that person's participation in those proceedings may be assessed against either party."), *with id.* 17.24.1307(2) ("Whenever any final order is issued in any administrative proceeding under the Act at the request of the permittee, permit applicant, or the department, appropriate and reasonable costs, expenses and attorney fees incurred by the permittee, permit applicant, or the department for or in connection with participation in the proceeding may be assessed against any party if it is demonstrated that the party participated in the proceeding in bad faith and for the purpose of harassing or embarrassing the permittee, permit applicant, or the department.").

## FACTUAL BACKGROUND

45.    The 68th Montana Legislature passed at least two bills—House Bill 576 and Senate Bill 392—that propose to change the Montana program in ways

that render it less protective and less effective than the corresponding provisions of the Surface Mining Act. Governor Gianforte signed both bills.

46.     In direct contravention of the Surface Mining Act, which prohibits proposed changes to a state program from becoming effective unless and until they are subsequently reviewed and approved by the relevant federal agencies, House Bill 576 and Senate Bill 392 purport to make their proposed changes to the Montana program *effective immediately*. House Bill 576 further asserts that its provisions apply retroactively to existing litigation. These immediate effectiveness and retroactivity provisions violate federal law.

*House Bill 576*

47.     House Bill 576, which drastically weakens the Montana program's protections of water resources, was drafted at the direction of a coal company lobbyist.

48.     The coal company lobbyist specifically requested that a retroactivity provision be inserted into the bill so that it would apply to existing lawsuits.

49.     At one point the lobbyist gave legislators a handout stating that the purpose of the bill was to reverse a decision of a Montana district court enforcing the water-protection provisions of the current Montana program.

50.     Numerous Montanans, including local ranchers, landowners, concerned citizens, and Conservation Groups spoke in opposition to House Bill 576.

51.     Lobbyists for coal companies, utilities, and industry groups supported House Bill 576.

52.     House Bill 576 proposes to change the Montana program's definition of "material damage" to water resources to allow violations of water quality standards. House Bill 576 deletes the provision of the current Montana program that defines material damage to include any "violation of a water quality standard." *See* H.B. 576, 68th Leg., Reg. Sess., sec. 2, § 82-4-203(32) (Mont. 2023) ("~~Violation of a water quality standard, whether or not an existing water use is affected, is material damage.~~"). Instead, House Bill 576 permits strip- and under-ground coal mines to violate water quality standards, so long as the violations are not perpetual or long term. *Id.* sec. 2, § 82-4-203(32) (defining material damage with respect to water quality standards as "<u>long-term or permanent exceedance of a water quality standard outside a permit area if caused by coal mining or reclamation operations, except that in water bodies for which the water quality standard is more stringent than baseline conditions as determined by the department's assessment of the cumulative hydrologic impact findings conducted pursuant to 82-4-222. For these water bodies, a significant, long-term adverse</u>

change to the baseline condition of water quality outside of a permit area is
material damage if coal mining or reclamation operations cause adverse effects to
land use, beneficial uses of water, or water rights").

53.    In contravention of the Surface Mining Act, 30 U.S.C. § 1257(B)(11),
House Bill 576 simply deletes the prohibition on DEQ's approval of a coal mining
permit before information about the hydrology of the area is available. H.B. 579,
68th Leg., Reg. Sess., sec. 3, § 82-4-222(1)(m) (Mont. 2023) ("~~However, this
determination is not required until hydrologic information on the general area prior
to mining is made available from an appropriate federal or state agency. The
permit may not be approved until the information is available and is incorporated
into the application.~~").

54.    In contravention of the oversight and review process required by the
Surface Mining Act, 30 C.F.R. § 732.17(g), (h), House Bill 576 purports to make
its drastic proposed changes to the Montana program effective immediately. H.B.
579, 68th Leg., Reg. Sess., sec. 6 (Mont. 2023) ("Effective date. [This act] is
effective on passage and approval.").

55.    Worse, House Bill 576 purports to make its proposed changes to the
Montana program retroactively applicable to existing litigation under the current
provisions of the program. H.B. 579, 68th Leg., Reg. Sess., sec. 7 (Mont. 2023)
("Retroactive applicability. [This act] applies retroactively, within the meaning of

1-2-109, to actions for judicial review or other causes of action challenging the issuance of a permit petition for review, amendment, license, arbitration, action, certificate, or inspection that are pending but not yet decided on or after [the effective date of this act].").

56.     Governor Gianforte signed House Bill 576 into law on May 19, 2023.

*Senate Bill 392*

57.     Senate Bill 392 removes the asymmetrical attorney's fee provision of the Montana program and establishes a "loser pays" regime, in which coal companies may seek fees against members of the public who bring non-frivolous but unsuccessful challenges to permitting decisions.

58.     Senate Bill 392 was supported by lobbyists for out of state coal companies, lobbyists for out of state utilities, and industry trade lobbyists.

59.     Senate Bill 392 was uniformly opposed by many Montanans, including ranchers, landowners, and conservation groups.

60.     The sponsor of Senate Bill 392 stated that the purpose of the bill was to deter the public from challenging coal mining operations.

61.     Senate Bill 392 provides that "[u]nless the context requires otherwise, a court or administrative agency that issues a final order in an action pursuant to Title 82, chapter 4, part 2 [the Montana program] may award the prevailing party

reasonable costs of litigation, including filing fees, attorney fees, and witness costs." S.B. 392, 68th Leg., Reg. Sess., sec. 1(1) (Mont. 2023).

62.     Senate Bill 392 then removes the requirement that fees be awarded asymmetrically based on the identity of the party seeking fees (which limits fees against members of the public to only those wholly unsuccessful cases brought in bad faith): "In awarding costs pursuant to this section, the court or administrative agency may not consider the identity of any party, including but not limited to a permittee, permit applicant, agency, public interest litigant, or other party to an action." *Id.* sec. 1(2).

63.     In direct contravention of the oversight and review process required by the Surface Mining Act, 30 C.F.R. § 732.17(g), (h), Senate Bill 392 purports to make its proposed changes to the Montana program—which benefit industry and harm the public—effective immediately.

64.     Chief legal counsel for DEQ testified that the "loser pays" provision of Senate Bill 392 is inconsistent with the Surface Mining Act.

65.     Chief legal counsel for DEQ further testified that the immediate effectiveness provision Senate Bill 392 is inconsistent with federal review and approval provisions of the Surface Mining Act.

66.     The 68th legislature passed Senate Bill 392, and Governor Gianforte signed the bill on May 8, 2023.

24

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (SMCRA Violation: Failure to Obtain Federal Review and Approval of House Bill 576)

67.    Plaintiffs incorporate by reference all preceding paragraphs.

68.    The Surface Mining Act's implementing regulations prohibit Defendants from enforcing proposed changes to the Montana program unless and until: Defendants notify OSMRE of the proposed changes; OSMRE reviews the proposed changes and solicits and accepts public and comment; OSMRE solicits and discloses the views of EPA and other federal agencies; EPA concurs in writing with respect to those changes related to water quality standards; and OSMRE approves the changes as consistent with and no less stringent than the Surface Mining Act and Clean Water Act. 30 C.F.R. § 732.17(b), (g), (h).

69.    House Bill 576 drastically weakens critical protections of water resources in the Montana program by permitting coal mining operations to violate water quality standards and by authorizing DEQ to approve permit applications without first possessing baseline information about potentially impacted water.

70.    The immediate effectiveness date and retroactivity provision of House Bill 576 violate the structural review provisions of the Surface Mining Act and its implementing regulations. 30 C.F.R. § 732.17(b), (g), (h).

71.    The immediate effectiveness date of House Bill 576 immediately

threatens Plaintiffs' legal interests in existing cases in the Montana Supreme Court,

Montana district court, and a Montana administrative board that are premised on

the provisions of the Montana program that protect water resources.

72.    Plaintiffs' legal interest in existing cases will be protected if

Defendants are enjoined from applying, effectuating, or enforcing the provisions of

House Bill 576 until they are reviewed by public and federal agencies.

## SECOND CAUSE OF ACTION

### (SMCRA Violation: Failure to Obtain Federal Review and Approval of Senate Bill 392)

73.    Plaintiffs incorporate by reference all preceding paragraphs.

74.    The Surface Mining Act's implementing regulations prohibit

Defendants from enforcing proposed changes to the Montana program unless and

until: Defendants notify OSMRE of the proposed changes; OSMRE reviews the

proposed changes and solicits and accepts public and comment; OSMRE solicits

and discloses the views of EPA and other federal agencies; EPA concurs in writing

with respect to those changes related to water quality standards; and OSMRE

approves the changes as consistent with and no less stringent than the Surface

Mining Act and Clean Water Act. 30 C.F.R. § 732.17(b), (g), (h).

75.    Senate Bill 392 removes the asymmetrical attorney's fee provisions of

the Montana program in violation of the Surface Mining Act's protections of

public participation. 43 C.F.R. § 4.1294(a)-(d). The "loser pays" provision of Senate Bill 392 threatens to expose members of the public to potentially ruinous adverse fee awards to coal companies and regulators.

76.    The immediate effectiveness date of Senate Bill 392 violates the structural review provisions of the Surface Mining Act. 30 C.F.R. § 732.17(b), (g), (h).

77.    The immediate effectiveness date of Senate Bill 392 immediately threatens and chills Plaintiffs' legal interests in being able to challenge unlawful permitting decisions by the Montana Department of Environmental Quality. DEQ has approved within the past weeks or imminently will approve coal mining permits (including renewals and revisions) that are subject to 30-day statutes of limitations. Plaintiffs' ability to challenge these decisions will be chilled by provisions of Senate Bill 392 if they are allowed to become immediately effective in violation of the review requirements of the Surface Mining Act.

78.    Plaintiffs' legal interest in challenging these decisions without being subject to the "loser pays" provisions of Senate Bill 392 will be protected if Defendants are enjoined from applying, effectuating, or enforcing the provisions of House Bill 576 until they are reviewed by public and federal agencies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Declare that the immediate effectiveness provision and retroactivity provision of House Bill 576 violate the Surface Mining Act and its implementing regulations;

B.      Declare that the immediate effectiveness provision of Senate Bill 392 violates the Surface Mining Act and its implementing regulations;

C.      Enjoin Defendants from applying, effectuating, or enforcing any provisions of House Bill 576 or Senate Bill 392 unless and until they are first reviewed by federal agencies and the public, as required by the Surface Mining Act, and ultimately approved by OSMRE and EPA.

D.      Award Plaintiffs their fees, costs, and other expenses as provided by the Surface Mining Act;

E.      Issue such relief as Plaintiffs subsequently request or that this Court may deem just, proper, and equitable.

Respectfully submitted this 1st day of June, 2023.

/s/ Shiloh Hernandez
Shiloh Hernandez
Mary Cochenour
Earthjustice
313 East Main Street
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699
mcochenour@earthjustice.org
shernandez@earthjustice.org

*Attorneys for Plaintiffs*