# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| MONTANA ENVIRONMENTAL CENTER, et al.,<br><br>　　　　　　Plaintiffs,<br><br>　v.<br><br>MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY, et al.,<br><br>　　　　　　Defendants,<br><br>　v.<br><br>STATE OF MONTANA, WESTMORELAND ROSEBUD MINING LLC,<br><br>　　　　　　Intervenor Defendants. | **CV-23-28-BMM**<br><br>**ORDER** |

## BACKGROUND

The Montana State Legislature passed two laws in 2023, House Bill 576 and Senate Bill 392, amending Montana's federally approved coal mine program. (Doc.

74 at 2.)  The Surface Mining Control and Reclamation Act ("SMCRA") requires the United States Office of Surface Mining Reclamation and Enforcement ("OSMRE") to review and approve of any changes to Montana's federally approved program before they may take effect.  30 C.F.R. 732.17(g).  Both HB 576 and SB 392 contain language making them "immediately effective upon passage and approval."  (Doc. 74 at 2.)  Plaintiffs ("MEIC"), Defendants ("DEQ"), and OSMRE agree that these provisions in H.B. 576 and S.B. 392 violate federal law.  (Doc. 76 at 15; Doc. 74 at 2, 7 n.1; Doc. 54-1 at 10.)

S.B. 392 imposes a "loser-pays" regime in which an unsuccessful party to judicial review stands liable for the prevailing party's attorney's fees. S.B. 392, 68th Leg., Reg. Sess., sec. 1 (Mont. 2023).  MEIC alleges that the fee-shifting provision in SB 392 prevented MEIC from challenging a recent mine expansion and would preclude judicial review of two currently pending administrative challenges.  (Doc. 76-1 at 4–5.)  H.B. 576 modifies the standards for evaluating whether "material damage" has occurred regarding water quality standards.  (Doc. 21 at 20–21.) MEIC alleges that H.B. 576 risks significant harm to water users in areas impacted by strip-mining.  (Doc. 76-1 at 3.)

MEIC sought a preliminary injunction preventing DEQ from applying, effectuating, or enforcing any provisions of H.B. 576 or S.B. 392 unless and until they are subject to public comment, review of federal agencies, and approved by

2

OSMRE and the United States Environmental Protection Agency ("EPA"). (Doc. 21 at 27.) MEIC and DEQ stipulated to a 210-day stay of the preliminary injunction and agreed not to take any action to apply, effectuate, or enforce H.B. 576 and S.B. 392 for the same 210-day period. (Doc. 9.) The stipulation and stay took effect on June 22, 2023. (Doc. 10.)

MEIC and DEQ later negotiated and moved for entry of a proposed consent decree. (Doc. 24; Doc. 24-1.) The proposed consent decree would ensure that DEQ would not "apply, effectuate, or enforce any provision of HB 576 or SB 392 unless and until it is reviewed and approved by the Director of OSMRE, pursuant to the provisions of 30 C.F.R. § 732.17 and the Montana cooperative agreement." (Doc. 24-1 at 7.) The Parties agreed that the proposed consent decree "is fair, adequate, reasonable, and consistent with the public interest and the purposes of SMCRA." (*Id.*) The State of Montana, through the Attorney General's Office, and Westmoreland Rosebud Mining LLC ("Westmoreland") intervened. (Doc. 37.) Intervenors the State of Montana and Westmoreland opposed entry of the consent decree. (Doc. 33; Doc. 31.)

The Court issued the stay pending OSMRE's review of the amendments to Montana's federally approved program presented by H.B. 576 and S.B. 392 and held in abeyance its consideration of the proposed consent decree. (Doc. 37 at 8.) The Court extended the stay on January 30, 2024 (Doc. 51), April 4, 2024 (Doc. 57),

June 6, 2024 (Doc. 60), and August 16, 2024 (Doc. 66). The Court conducted a telephonic status conference on November 12, 2024, to discuss entry of the consent decree because OSMRE had not issued a final decision. (Doc. 71.) The Parties submitted supplemental briefing on their respective positions. MEIC and DEQ supported entry of the consent decree. (Doc. 76; Doc. 74.) Intervenors Westmoreland and the State of Montana opposed entry of the consent decree. (Doc. 77; Doc. 78.)

The State of Montana argues that no justiciable controversy exists between the parties and that even if it does, the proposed consent decree "blesses potentially perpetual injunctive relief against a Montana stage agency." (Doc. 77 at 9–10.) Westmoreland echoes the State of Montana's mootness and standing arguments and adds that the consent decree includes no predicate finding that H.B. 576 and S.B. 392 violate federal law. (Doc. 78.) DEQ and MEIC argue that the lawfulness of the "immediately effective" provisions of the two laws remains properly before the Court (Doc. 74 at 7–8), that the Parties' cooperative negotiation of a consent decree does not obviate the dispute between MEIC and DEQ over the two laws (Doc. 76 at 11), and that the pace of OSMRE's review of the two laws does not render the consent decree indefinite (Doc. 76 at 15). The Court agrees. The Court finds that the "immediately effective" provisions of H.B. 576 and S.B. 392 conflict with the

federal review process required by the SMCRA. 30 C.F.R. 732.17(g). The Court will enter the consent decree.

## STANDARD OF REVIEW

Approval of a proposed consent decree falls within the sound discretion of the court. *United States v. Oregon,* 913 F.2d 576, 580 (9th Cir.1990); *SEC v. Randolph,* 736 F.2d 525, 529 (9th Cir.1984). In general, "a consent decree reflects the parties' understanding of the best remedy, and, subject to judicial approval, the parties to a consent decree enjoy at least as broad discretion as the District Court in formulating the remedial decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 403 (1992) (citations omitted) (JJ. Stevens and Blackmun, dissenting). A court should enter a consent decree if "it is fair, reasonable and equitable and does not violate the law or public policy." *Sierra Club v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir.1990). "If the consent decree 'comes within the general scope of the case made by the pleadings, furthers the objectives upon which the law is based, and does not violate the statute upon which the complaint was based, the agreement should be entered by the court.'" *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 834 F. Supp. 2d 1004, 1008–09 (D. Haw. 2011) (quoting *Sierra Club*, 909 F.2d at 1355).

Article III standing requires a "specific live grievance." *Goosby v. Osser*, 409 U.S. 512, 517 (1973) (quoting *Golden v. Zwickler*, 394 U.S. 103, 110 (1969)). Courts lack jurisdiction to adjudicate cases presenting merely "a friendly, non-adversary, proceeding . . . because to decide such questions is legitimate only in the last resort, and as a necessity in the determination of real, earnest, and vital controversy between individuals." *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346 (1936) (internal quotations and citations omitted). A court should dismiss a "collusive" suit, one that is "not in any real sense [an] adversary" proceeding. *United States v. Johnson*, 319 U.S. 302, 305 (1943). When a party "has had no active participation, . . . exercised no control," bore none of the expense, and had no interaction with counsel, a suit appears "collusive." *Id.*

The parties' eventual agreement on an issue, however, does not remove standing. *Immigr. & Naturalization Serv. v. Chadha*, 462 U.S. 919, 939 (1983) ("[I]t would be a curious result if, in the administration of justice, a person could be denied access to the courts because the Attorney General of the United States agreed with the legal arguments asserted by the individual."). A plaintiff may seek a consent decree notwithstanding the "state's concession" that a provision is unlawful because "that concession is not necessarily binding on future state officials who might choose to attempt to enforce" it. *Nozewski Polish Style Meat Prods. v. Meskill*, 376 F. Supp. 610, 611 (D. Conn. 1974). Even if parties to a

6

consent decree lack the requisite adversarial relationship, an intervenor-defendant who intends to seek enforcement of a law may supply the necessary controversy. *Chadha*, 462 U.S. at 939.

## DISCUSSION

The fact that two parties agree to the terms within a consent decree does not moot an action. *Topanga Press, Inc. v. City of Los Angeles*, 409 F. Supp. 2d 1188, 1191 (C.D. Cal. 2005). A consent decree's call for prospective injunctive relief overcomes any argument that a controversy lacks standing "because the parties arrived in court with the proposed judgment in hand." *S.E.C. v. Randolph*, 736 F.2d 525, 528 (9th Cir. 1984). A live controversy exists absent a consent decree when a government entity may attempt to enforce a law, even if the governmental entity so far has chosen not to enforce the law.

The City of Los Angeles entered a consent decree in *Topanga Press, Inc.*, that prevented the City from enforcing unconstitutional provisions of a permit application process for adult arcades. *Topanga Press, Inc.*, 409 F. Supp. 2d at 1189–90. The district court maintained "permanent jurisdiction" to enforce the consent decree until the City amended the permit application process to conform with the terms of the consent decree. *Id.* at 1190. The City declined to amend the permit application process and "simply chose not to enforce its adult arcade

7

provisions." *Id.* Years later, the City amended most aspects of the permit application process, though it did not implement the exact provisions of the consent decree. *Id.* The district court recognized that a case or controversy existed at the time the parties entered the consent decree. The same controversy remained when the parties agreed that the permit application law was unenforceable. The district court further determined that the controversy's justiciability continued after the City had amended the law in question:

> In this case, the parties disagree over the continuing prospective application of the 1991 consent decree. If the City is still bound by the decree, it cannot enforce certain adult arcade regulations against the plaintiffs. *If the City is no longer bound by the decree, it can enforce its arcade regulations against the plaintiffs.* Therefore there is still a live controversy.

*Topanga Press, Inc.*, 409 F. Supp. 2d at 1191 (emphasis added). The city's *ability* to enforce the permit application process, as opposed to its intention to enforce the permit application process, conferred standing.

Intervenors argue that MEIC lacks Article III standing because MEIC and DEQ "*never* had even a *scintilla* of a disagreement as to whether the challenged statutes could go into effect without prior federal approval." (Doc. 77 at 8 (original emphasis).) In support of this proposition, Intervenors point out that DEQ's then-chief legal counsel testified against including the "immediately effective" provisions during a hearing on S.B. 392. (Doc. 78 at 7.) The legislative testimony of DEQ's former legal counsel fails to indicate that DEQ colluded with

8

MEIC to manufacture a future lawsuit invalidating two laws that the legislature had not passed at the time of the testimony.  MEIC filed a complaint alleging that DEQ's enforcement of S.B. 392 and H.B. 576 would violate the SMCRA.  (Doc. 1.)  DEQ answered and denied the allegations.  (Doc. 11.)  Intervenors fail to show that the Parties lacked a true controversy at the time the complaint or first amended complaint were filed on the basis of a DEQ employee's advice to the legislature regarding one of these laws.

      The Parties' efficient negotiation of a consent decree, though it outpaced OSMRE's review of the laws in question, does not prove that MEIC and DEQ "never" had a live disagreement.  In fact, as the State of Montana pointed out, the Parties expected OSMRE to have acted on DEQ's application to amend its program by December 6, 2023, and to have issued a published decision by January 5, 2024.  (Doc. 33 at 2.)  MEIC and DEQ would have anticipated the imminent need to negotiate the consent decree, proposed September 22, 2023, and the likelihood that the consent decree would expire within a few months.  OSMRE's failure to process the application within the allocated timeframe does not evidence any collusive intent or feigned controversy by MEIC or DEQ.  Intervenors' argument that the Parties lack standing because of the timing of the Parties' stipulation and negotiation of the consent decree also fails.

MEIC has demonstrated that the "immediately effective" provisions of HB 576 and SB 392 affect how it may pursue active and ongoing litigation. DEQ and MEIC agree that the consent decree would protect both Parties while OSMRE's decision remains pending. DEQ so far has not enforced the provisions of HB 576 and SB 392. DEQ may enforce these new laws at any time absent the consent decree. The Court already has recognized that the consent decree will expire once OSMRE has issued its final decision on HB 576 and SB 392. (Doc. 37 at 8; Doc. 24-1 at 9.) Contrary to Intervenors' assertions, the consent decree appears neither "indefinite" nor "potentially perpetual" in nature. (Doc. 77 at 11.) The consent decree will expire as soon as OSMRE issues an official decision on the matter. Binding MEIC and DEQ with the consent decree while OSMRE conducts its review process does not prejudice Intervenors, neither of whom are bound by it.

## CONCLUSION

No evidence indicates that MEIC and DEQ colluded to bring a non-adversarial suit before this Court. MEIC had standing to pursue this claim, and the Parties' negotiation of a consent decree does not moot the controversy. The consent decree presents a fair resolution of the issue during the federal review process and protects the public interest by saving the cost of litigating an issue that OSMRE will eventually resolve.

## ORDER

Accordingly, **IT IS ORDERED:**

1. Plaintiffs' and Defendants' Joint Motion for Entry of Consent Decree (Doc. 24) is **GRANTED**.

DATED this 22nd day of January, 2025.

_____
Brian Morris, Chief District Judge
United States District Court